25 CV 1594

# IN THE US DISTRICT COURT FOR THE DISTRICT OF MARYLAND

SUSAN I. NWOGA
14908 Meanderwood Lane
Burtonsville, MD 20866
443-955-3081
*plaintiff*



v.

~~SILVERMAN, THOMPSON, SLUTKIN & WHITE~~ (STSW)
BRIAN THOMPSON
MONICA SCHERER
ANDY WHITE
STEVE SILVERMAN
RICHARD KARCESKI
ANDY SLUTKIN
400 E Pratt St Suite 900
Baltimore, MD 21202
(410) 385-2225

~~WRIGHT, CONSTABLE & SKEEN (WCS)~~
MICHEAL STANLEY
HOWARD SCHULMAN
1 Olympic Place, Suite 800
Towson, MD 21204
410-659-1300
*defendants*

Civil Action No. MJM: (to be assigned)

## COMPLAINT

1. Susan I. Nwoga ("Mrs. Nwoga"), *pro se,* files this complaint against Silverman Thompson Slukin and White (STSW), Wright, Constable & Skeen, LLC, Brian Thompson, Monica Scherer, Andy White, Andy Slukin, Steve Silverman, Howard Schulman, Michael Stanley, and Richard Karceski (collectively, "Defendants"). The actions filed against the defendants are: *Mail Fraud (18 U.S.C. § 1341), Wire Fraud (18 U.S.C. § 1343), Racketeer Influenced and Corrupt Organizations Act (RICO) violations (18 U.S.C. §§ 1961-1968), Violation of Consumer Protection Principles in Attorney-Client Relationships, and False Statements (18 U.S.C. § 1001).*

2.  Silverman, Thompson, Slutkin, and Wright, Constable & Skeen represented Mrs. Nwoga in a Medicaid fraud case while simultaneously representing the government attorneys prosecuting her in a case where prosecutors admitted destroying evidence in a case identical to Mrs. Nwoga's. In 2024, STSW and WCS acknowledged their awareness of a conflict of interest but did not disclose this information to Mrs. Nwoga, who was subsequently charged over $136,000 in fees.

## PARTIES

3. Mrs. Nwoga: Susan Nwoga is a Burtonsville, MD resident who has suffered damages due to the Defendants' legal malfeasance and unethical representation.

4. Defendant Silverman, Thompson and Wright, Constable & Skeen, LLC: A law firm based in Baltimore, MD, providing legal representation across various matters, including healthcare law.

5. Defendant Brian Thompson: A founding partner of the firm, charged with maintaining ethical standards and overseeing legal practices.

6. Defendant Monica Scherer: A founding partner responsible for the firm's practices and ethical compliance.

7. Defendant Andy White: An attorney at the firm whose actions played a role in the present conflict of interest.

8. Defendant Steve Silverman: A founding partner responsible for the ethical practices within the firm.

9. Defendant Andy Slutkin: A founding partner responsible for the ethical practices within the firm.

10.    Defendant Howard Schulman: An attorney involved in the legal representation issues affecting Mrs. Nwoga.

11.    Defendant Michael Stanley: Managing partner and attorney responsible for maintaining ethical practices.

12.    Defendant Richard Karceski is an attorney whose representation contributed to the malfeasance.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction under *28 U.S.C. § 1331* because this complaint presents several federal law claims. Specifically, the causes of action explicitly cite and rely on federal statutes, including Mail Fraud *(18 U.S.C. § 1341)*, Wire Fraud *(18 U.S.C. § 1343)*, *Racketeer Influenced and Corrupt Organizations Act (RICO)* violations (*18 U.S.C. §§ 1961-1968*), and False

Statements (18 U.S.C. § 1001). Claims predicated on violations of these federal criminal statutes and the comprehensive federal RICO statute inherently arise under federal law. Allegations of making false statements within the jurisdiction of a federal agency or the federal courts also establish federal question jurisdiction. These substantial federal law claims independently vest this Court with subject matter jurisdiction.

14.    Venue is proper in the District of Maryland under *28 U.S.C. § 1391(b)*. This statute provides that a civil action may be brought in this district. Furthermore, venue may also be proper under § 1391(b)(1) because the complaint identifies the principal places of business for the defendant law firms, STSW and Wright, Constable & Skeen, as Baltimore and Towson, Maryland, respectively, both of which are located within the District of Maryland. To the extent that all named individual defendants reside within Maryland, venue would also be proper under this provision.

## STATEMENT OF FACTS

15.    At its heart, this case is about two immigrant pharmacists who came to the United States for a better life and the corrupt prosecutors and lawyers who drove them out of business. One pharmacist, Reddy Annappareddy, was the founder and owner of Pharmacare, a now-shuttered chain of pharmacies that once had nine locations in several states. The other, Susan Nwoga, is a pharmacist who owned Poplar Grove Pharmacy, which became the heart of a troubled neighborhood.

16.    Both cases begin with Maryland Medicaid's Fraud Unit. At roughly the same time, government employees investigated Mr. Annappareddy and Mrs. Nwoga using the same unlawful tactics. The pharmacists were prosecuted two years apart, with Mr. Annappereddy being the first.

17.    The corruption was first discovered during Mr. Annappareddy's case in the Federal Court. The lead prosecutor, Assistant U.S. Attorney Sandra Wilkinson, told the jury that Mr. Annappareddy presided over a sham, billing government health insurance programs for expensive prescription pills to treat HIV and cancer that customers never received. The prosecutor said he fleeced the government out of several million dollars. In December 2014, he was convicted.

18.    Mr. Annappareddy hired a new lawyer who dug into the evidence in his case. Mr. Annappereddy's new lawyer unearthed incontrovertible evidence that Ms. Pascale and Ms. Lating systematically campaigned to destroy documents, falsify evidence, and employ faulty accounting practices to secure his conviction. These women are two critical players in Mrs. Nwoga's case, too, because Mrs. Nwoga and Mr. Annappereddy were investigated roughly by the same people, using

the same unlawful tactics. The investigations into Mrs. Nwoga and Mr. Annappereddy employed similar unlawful tactics and were conducted by the same personnel.

19.     The tactics employed by Ms. Pascale and Ms. Lating raise significant concerns about the fairness and integrity of every case they touch. Their history of destroying documents and falsifying evidence points to a systemic issue transcending a single case. It shows a willingness to circumvent the law, compromising the rights of individuals and the pursuit of justice. It's worse when you realize they target immigrants and threaten them with deportation.

20.     Mr. Annappereddy's appeal was in the Federal Court before Judge George Russell. Getting a case dismissed because of government misconduct is rare. However, Judge Russell also found the government team falsified evidence and destroyed documents.  He dismissed Mr. Annappereddy's case with prejudice. He said the conduct by Ms. Pascale and Ms. Lating "does shock the conscience of this court."

21.     Judge Russell's suspicions hinted at a troubling pattern beyond the courtroom's walls. However, this intuition only scratched the surface of a more sinister reality.

22.     Unbeknownst to Judge Russell, while these women presented a facade of innocence in Federal Court, they were engaged in a parallel campaign of deceit against Mrs. Nwoga in State court. Their modus operandi involved faulty accounting, manipulated numbers, and a targeted assault on the vulnerable.

23.     Ms. Pascale and Ms. Lating's actions were part of a deliberate strategy, weaponizing their positions of power to target innocent immigrants. By threatening them with deportation, they exploited fear and uncertainty, leveraging it as a tool to coerce and control. This tactic not only undermined the principles of justice but also preyed on individuals seeking a better life, turning their American dream into a nightmare.

### *State v Reddy Annappereddy*

24.     In 2012, Maryland's Medicaid Fraud Control Unit ("MFCU") began investigating Pharmacare's billing practices after a former employee accused the company of billing government healthcare programs for never-delivered prescriptions.  MFCU investigators soon began working with a pharmacist at Pharmacare's stores, Ms. Ridolfi, to gather evidence.

25.     Mr. Annappereddy said Ms. Ridolfi hoped to receive payment as a  "whistleblower," and she began fabricating evidence of fraud against him. Ms. Ridolfi is also a corrupt government

worker in Mrs. Nwoga's case. According to Mr. Annappareddy, Ms. Ridolfi's primary contact at the MFCU, investigator Pam Arnold, was aware of and encouraged these fabrications and passed the false information to prosecutors "as if it were accurate and reliable." She did the same thing to

26.    Mrs. Nwoga.

27.    At some point in 2013, federal law enforcement joined the investigation. The federal Law enforcement team began building a case in which Mr. Annappareddy submitted claims for high-dollar medications that patients never filled or received. Ms. Lating took over the leadership of analyzing

28.    financial records for the team of investigators.

29.    A special agent in the Office of Inspector General of the U.S. Department of Health & Human Services ("HHS") worked with a Medicare drug integrity contractor ("MEDIC") to prepare what would turn out to be a critical, faulty analysis of Pharmacare's invoices and inventory. The number was fabricated in Mrs. Nwoga's case, too.

30.    On July 23, 2013, a magistrate judge issued sealed warrants to search six Pharmacare locations. To secure those warrants, Ms. Lating submitted an affidavit (called the "Lating Affidavit") that Mr. Annappareddy claims establishes probable cause through "materially false statements and omissions." Most importantly, the Lating Affidavit included the MEDIC "invoice review" described above, which falsely showed that Pharmacare had medication shortages. Ms. Lating also worked during Mrs. Nwoga's investigation.

31.    Other claimed flaws in the Lating Affidavit[1] included misstatements of the law governing prescription billing and information provided by untrustworthy informants. Mr. Annappareddy alleges that Ms. Lating had "actual knowledge" of these fabrications and falsehoods and "acted at least recklessly in making them." And without this flawed evidence, he contends, the Lating Affidavit would not have established probable cause, and the magistrate judge would not have issued the warrants. In Mrs. Nwoga's case, the State refused to turn over the grand jury transcripts, leading her to suspect that a similar Lating Affidavit was used in her case.

---

[1] UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT No. 19-2285 REDDY VIJAY ANNAPPAREDDY, Plaintiff – Appellee, v. CATHERINE SCHUSTER PASCALE, Defendant – Appellant, and MAURA LATING; ROBERT MOSLEY; PAM ARNOLD; JAMES P. RYAN; SANDRA WILKINSON; STEVEN CAPOBIANCO; UNITED STATES OF AMERICA,

32.    The cases of Mr. Annappareddy and Mrs. Nwoga reveal a troubling pattern of prosecutorial misconduct that demands immediate attention and rectification. Both individuals, respected pharmacists within their communities, found themselves ensnared in a legal nightmare, not due to any wrongdoing on their part, but because of a deliberate misuse of power by those charged with upholding the law.

33.    A false indictment was at the heart of Mr. Annappareddy's legal woes. Healthcare fraud and theft charges were not the result of a diligent investigation. Still, they were instead based on evidence known to be false by the investigative team, including Ms. Lating and Ms. Pacale. This same disregard for the truth was mirrored in Mrs. Nwoga's case, where Ms. Fruman was aware of the critical errors in the report used against her but presented them to the Court anyway.

34.    The subsequent raids on Pharmacare locations carried out with much fanfare were not the culmination of a rigorous investigation but a spectacle based on a foundation of deceit. Sandra Wilkinson, an assistant U.S. attorney, and Ms. Pascale, assistant attorney general and special assistant U.S. attorney, managed the prosecution and added a veneer of legitimacy to anything but legitimate proceedings. Their decision to pursue new analyses to support their case, despite being aware of the evidence's flawed nature, is indicative of a pursuit of conviction

35.    at all costs, ethics be damned. The actions of Ms. Wilkinson, Ms. Pascale, and their team are a stark reminder of the damage that can be wrought when the guardians of the law turn their backs on it.

36.    This falsified evidence led to Mr. Annappareddy's conviction by a Maryland District jury on two out of three charges in the amended indictment on December 15, 2014.

37.    Following the conviction, Mr. Annappareddy was allowed to remain free on conditional release, which included home detention, pending the sentencing phase. The government requested the district court to impose a 12-year prison sentence on Mr. Annappareddy, which would be followed by deportation. Mr. Annappareddy hired a new lawyer, who exposed the corruption.

38.    In Mrs. Nwoga's case, they whisked her to prison the day she was convicted because of what happened in the Annappareddy case. She was sent straight to prison pending sentencing because they didn't want her to hire a new lawyer. They learned from their mistake in Annappareddy.

39.    Subsequent examination of the evidence in Mr. Annappareddy's case revealed critical errors in the inventory calculations that prosecutors relied on during the trial. This incorrect analysis

was crucial in proving the medication shortages for which Pharmacare had charged various government insurance programs and the supposed financial losses to the government. False evidence was also used to support financial losses to the government in Mrs. Nwoga's case.

40.    Mr. Annappareddy indicated that despite having access to specific documents during the pre-trial discovery phase, he did not realize their potential to exonerate him until Josh Greenberg became his new lawyer. In a significant turn of events, in March 2015, prosecutors Ms. Pascale and her co-workers convened in the U.S. Attorney's Office, where they decided to dispose of these materials. Wilkinson later justified the act, claiming it was simply part of clearing accumulated paperwork.  But they only destroyed four out of 100 boxes of evidence, and the four boxes proved Mr. Annappareddy's innocence and prosecutorial misconduct.

41.    Mr. Annappareddy's new lawyer forced prosecutors to disclose a half-page memo. In the memo, Ms. Lating described an order from the lead prosecutor to get rid of the four boxes. She shredded the evidence.

42.    The district court expressed concern over the government's decision to unilaterally destroy several boxes of documents while the motion for a new trial was still pending. Judge Russell dismissed Mr. Annappareddy's case with prejudice, harshly addressing the prosecutors and calling for an investigation into the MFCU and individual players.

43.    It got worse when Mrs. Nwoga was trapped in a nearly identical web of false charges that once trapped Mr. Annappareddy. The involvement of Ms. Ridolfi, a character already tainted by corruption, in Mrs. Nwoga's case adds layers of betrayal to an already complex legal saga.

44.    It is shocking that Silverman Thompson, the firm hired to defend Mrs. Nwoga against the false charges levied by Ms. Pascale, also represented Ms. Lating. This conflict of interest lays bare a sabotaged conspiracy of silence and sacrifice in Mrs. Nwoga's Defense.

45.    This saga transcends the personal plight of Mr. Annappareddy and Mrs. Nwoga, illuminating the darker recesses of these government officials who target immigrants with false charges and threaten them with deportation. Mr. Annappareddy was born in India, and Mrs. Nwoga was born in Nigeria. The battle waged by Mr. Annappareddy and Mrs. Nwoga is not just for their vindication but also to protect the other immigrants these people target with false charges.

### *State v Susan I. Nwoga*

46.     While Mr. Annappareddy was fighting in Federal Court, Mrs. Nwoga was fighting the Board of Pharmacy, the first step in her illegal prosecution. Mrs. Nwoga's saga began when an inspection led to an administrative hearing before the Board of Pharmacy, spearheaded by Ms. Tracee Fruman. The heart of the matter lay in a series of minor record-keeping errors and fake prescriptions unknowingly filled by Mrs. Nwoga that were identified during the inspection.

47.     In the eyes of the Board, these infractions were neither deliberate nor criminal offenses but, instead, civil errors meriting correction and education rather than prison sentences. Subsequently, Mrs. Nwoga was subjected to a fine, placed on administrative probation,  and mandated to take a record-keeping class—a penalty she fulfilled diligently, achieving perfect compliance, catching fake prescriptions, and enhancing her record-keeping practices. Mr. Howard Schulman was Mrs. Nwoga's lawyer during the Board of Pharmacy proceedings. This became important because he knew the Board of Pharmacy said Mrs. Nwoga's small record-keeping error and fake prescriptions she unknowingly filled were not criminal. Yet, he didn't introduce that evidence at trial.

48.     Mr. Schulman said Ms. Fruman's and her coworkers' actions were so bad that Mrs. Nwoga should file a tort claim against them.   Mr. Schulman didn't bring this up either during his Defence of Mrs. Nwoga at her trial.

49.     Ms. Fruman was furious and embarrassed about losing the case against Mrs. Nwoga. Moreover, she was informed that Mrs. Nwoga had enough evidence of her incompetence and misconduct to file a tort claim.  Ms. Fruman knew if  Mrs. Nwoga faced criminal charges, she couldn't file a tort claim against her. Again, this is something Mrs. Nwoga's lawyers knew but didn't bring up at trial.

50.     Ms. Fruman's next step was to get  Ms. Pascale to use the same prescriptions the Board of Pharmacy said were not criminal to convince the DEA to prosecute Mrs. Nwoga.  At the time, Ms. Pascale was defending herself from prosecutorial misconduct against Mr. Annappareddy while committing prosecutorial misconduct against Mrs. Nwoga.

51.     After examining the evidence, the DEA concluded that the old prescriptions contained minor record-keeping errors and were not criminal offenses. The DEA added that they had watched Mrs. Nwoga's store for years, even sending in several confidential informants to try to catch Mrs. Nwoga doing anything illegal. Mrs. Nwoga caught every fake prescription that came through her door, even keeping a record of unscrupulous doctors and people who passed counterfeit prescriptions.

52.     The DEA even sent Ms. Pascale their investigation reports, proving Mrs. Nwoga wasn't doing anything wrong. She was helping keep dangerous drugs off the streets of Baltimore City. Ms. Pascale and Ms. Fruman became even more furious that the DEA wouldn't press charges against Mrs. Nwoga.

53.     Ms. Pascale was in trouble in Federal Court and needed a "win" to save face among her coworkers, her boss, who was running for reelection, and the legal community. After Judge Russell's comments, a review of pending cases was conducted. The review led to 71 cases, 51 dismissed because of prosecutorial misconduct. Ms. Pascale also faced a potentially expensive civil judgment in Mr. Annappareddy's case. She needed to convict someone to get the attention off of herself.  Ms. Fruman was concerned that Mrs. Nwoga had a tort claim against her. Neither Ms. Pascale nor Ms. Fruman could let Mrs. Nwoga win.

54.     In an astonishing maneuver, Ms. Pascale and Ms. Fruman circumvented the traditional federal pathway for Mrs. Nwoga's case instead expedited it through the Baltimore City Circuit Court. This strategic decision came despite explicit advisories from the Board of Pharmacy and the DEA, which had previously examined the prescriptions and concluded that they did not constitute criminal behavior. The implications of this decision are profound, underscoring a deliberate attempt to sidestep the scrutiny of a federal court that might have been more rigorous in its examination of the evidence and more critical of the prosecutorial conduct.

55.     The troubling parallels between Mrs. Nwoga and Mr. Annappareddy's cases cannot be ignored. Both cases were marred by allegations of prosecutorial misconduct, including the destruction of evidence and the use of discredited evidence. When Judge Russell publicly criticized Ms. Pascale for handling Mr. Annappareddy's case, the veil began to lift on their unlawful behavior.

56.     Ms. Pascale's insistence that the destruction of evidence in Mr. Annappareddy's case was an "innocent mistake" now rings hollow. The revelation that she employed the same questionable tactics against Mrs. Nwoga, while assuring Judge Russell of her innocence, shows her actions and intentions.

57.     As evidenced in their handling of both cases, Ms. Pascale and Ms. Fruman's actions suggest a willingness to prioritize convictions over the pursuit of justice. This stance is antithetical to the foundational principles of the legal profession.

58.     The gravity and implications of these actions for Mrs. Nwoga cannot be overstated. Mrs. Nwoga's story is not just a personal nightmare; it calls for a critical examination of prosecutorial

conduct and the mechanisms to prevent power abuse. Worse still the government showed pictures of Ms. Nwoga's minor children to known drug dealers as a way to intimidate Mrs. Nwoga to plead guilty [**Exhibit # 13**]

### The Unlawful Actions Begin

59.    On April 24, 2018, Mrs. Nwoga was indicted on Federal charges in Baltimore City Circuit Court. She was accused of various charges related to her pharmacy operations, including Conspiracy to Commit Medicaid Fraud,  Theft of Over $100,000, and a significant 316 counts of  Distribution of a Controlled Dangerous Substance.

60.    Mrs. Nwoga's lawyer, Mr. Schulman, who we described earlier as the one who knew the Board of Pharmacy and the DEA, ruled that Mrs. Nwoga had only committed minor record-keeping errors and not criminal actions, and suggested that Mrs. Nwoga file a Tort claim for misconduct.

61.    After Mrs. Nwoga was arrested, Mr. Schulman recommended that prominent criminal defence attorney Richard Karceski lead the team [**Exhibit # 14**]. Mr. Karceski works for Silverman Thompson, and his law partners represent Ms. Lating and are part of the team representing Ms. Pascale. This is when the conspiracy, fraud, theft, and deceit began. Silverman Thompson started to represent both the prosecution and the Defence.

62.    In the wake of the scandal that marred the prosecution of  Mr. Annappareddy, one might expect those involved to tread carefully, ensuring their professional conduct remains beyond reproach. However, the subsequent handling of Mrs. Nwoga's case suggests otherwise, offering a compelling narrative of repeated misconduct, albeit under the guise of legal representation—the actions of Ms. Pascale, Ms.Fruman, Mr. White, Mr. Karceski, Mr. Silverman, and Mr.  Schulman, in the Nwoga case, seem to indicate not just a failure to learn from past mistakes but a deliberate choice to engage in a similar pattern of behavior, ostensibly to protect one of their own - Ms. Pascale.

63.    The involvement of Ms. Pascale, Ms. Fruman, alongside Mr. White, Mr. Karceski, and Mr. Schulman, in orchestrating a Defence for Ms. Nwoga was a facade. Charging over $106,000 in legal fees, Silverman Thompson, along with Mr. Schulman, who charged an additional $30,000, ostensibly provided legal services that were, by all accounts, designed to fail. This was not a case of inadequate Defence but a calculated effort to undermine Ms. Nwoga's case to safeguard Ms. Pascale's interests.

64.     The evidence pointing to a conspiracy to defraud Ms. Nwoga is compelling, laying bare a strategy not of Defence but of deliberate sabotage. This act of charging exorbitant fees with the ulterior motive of providing no natural Defence constitutes a clear case of theft by deception and fraud. Through their actions, Ms. Pascale, Ms. Fruman, Mr. White, Mr. Karceski, and Mr. Schulman have not only breached the trust placed in them by their client but have also flagrantly violated the ethical standards that govern their profession.

65.     The narrative here is not just one of professional failure but of a calculated conspiracy to undermine the legal process for personal or collective gain. The evidence supporting this claim is robust, depicting a concerted effort to deceive and defraud Ms. Nwoga.

### The First Conflict: Brent Matthews and His $40 Million Lawsuit

66.     Umar Burley and Brent Matthews purportedly spent ten years in prison after being wrongfully convicted by the Baltimore Police's Gun Trace Task Force, which was later found to be corrupt. Following a $40 million lawsuit filed by STSW, the city of Baltimore and the State of Maryland paid them a $7.9 million settlement, with their lawyers taking 40% of that amount. Mr. Matthews was scheduled to testify for Mrs. Nwoga, but Mr. Karceski said his firm filled out the subpoenas incorrectly. Mrs. Nwoga alleges they didn't want Mr. Matthews to testify because Mrs. Nwoga was going to present a prescription filled by Mr. Matthews. At the same time, he was supposedly incarcerated, jeopardizing the $7.9 million settlement.

67.     The revelation that Mrs. Nwoga needed to sign a conflict-of-interest waiver, presented to her at the eleventh hour and under circumstances suggesting it was a mere formality, underscores the deceptive practices employed by Silverman Thompson. This move, designed to protect the firm from liability while pressuring Mrs. Nwoga into compliance, epitomizes the manipulation and betrayal she faced at the hands of her legal representatives.

68.     Mr. Karceski and Mr. Schulman did not tell Mrs. Nwoga that they represented both the prosecution and the defense, which was a serious issue of legal malfeasance and fraud.

69.     Their silence on the actions of Ms. Pascale and Ms. Lating, despite the known evidence of destruction and presentation of false evidence, is indefensible. This is especially egregious considering their purported century of combined legal expertise, which should have informed them of the impossibility and ethical indefensibility of waiving such conflicts of interest.

70.    Mr. Karceski and Mr. Schulman's insistence on the necessity of a conflict-of-interest waiver for Mr. Matthews, coupled with their failure to disclose their representation of figures like Ms. Lating and Ms. Pascale, highlights not only their manipulative tactics but also their conscious decision to conspire in keeping their dual representation a secret.

71.    Their actions compromised Mrs. Nwoga's legal Defence and betrayed the fundamental principles of legal ethics and client representation. This case is a stark reminder of the paramount importance of transparency, integrity, and the prioritization of client interests within the legal profession.

72.    Ultimately, Mrs. Nwoga faced her trial unprepared and unaware of the full extent of the conspiracy against her, which resulted directly from her attorneys' deliberate actions and omissions. This situation underscores a profound betrayal, leveraging legal expertise not to uphold justice but to navigate and exploit its boundaries for personal gain.

**The State's Case Against Mrs. Nwoga**

73.    Mrs. Nwoga found herself entangled in a nightmare legal battle. This wasn't just any dispute; it was a chilling narrative of deceit, manipulation, and wrongful persecution led by the very individuals entrusted with upholding justice.

74.    The prosecution's relentless pursuit of a conviction against Mrs. Nwoga was misguided and alarmingly malicious. In this case, the ends were deemed to justify the means, even if those means involved intimidating witnesses and fabricating evidence. The state's actions were not merely overzealous; they were a calculated assault on an innocent individual's rights and dignity.

75.    Central to this saga was Ms. Fruman's desperate need to see Mrs. Nwoga convicted, stemming from a fear of being exposed for her unlawful actions. Similarly, Ms. Pascale's motivations were deeply personal and professional.

76.    The prospect of a lawsuit loomed large, with potential repercussions that included criminal perjury charges and the loss of her law license. Her claims of "innocent mistakes" were a thinly veiled attempt to cover up a series of deliberate and unethical actions that had been taken to secure Mrs. Nwoga's conviction and salvage her reputation and career.

77.    The involvement of Silverman Thompson adds a further layer of complexity to this already intricate case, introducing a staggering motive of $40 million to secure Mrs. Nwoga's conviction. Their actions transcended the objective of winning a single case; they were about maintaining a vast

network of influence and reciprocity that stretched far beyond the confines of the courtroom. This was not merely a situation where they deceived Mrs. Nwoga into parting with over $106,000 for legal Defence; Silverman Thompson sabotaged her Defence.

78.     At the heart of this legal deceit was the shocking manipulation of evidence. The prosecution's case against Mrs. Nwoga was not built on facts but on a foundation of lies and deceit. Such actions are antithetical to the principles of justice and fairness that the legal system purports to uphold. By engaging in these unethical practices, the state compromised the integrity of Mrs. Nwoga's trial and eroded public trust in the legal process.

79.     The state's strategy in this case was not about seeking truth or justice; it was about securing a conviction by any means necessary, regardless of the consequences. This blatant disregard for ethical standards and the well-being of an individual is a stark reminder of the dangers of prosecutorial overreach and the need for vigilance in protecting the rights of all citizens.

**The Bench Trial**

80.     To understand what happened during the bench trial, it's important to closely examine Mr. Karceski's credibility and actions on the first day. First, Mr. Karceski complained that the state did not give him some prescription binders. Judge Shar asked if you weren't ready for the trial, why didn't you ask for a postponement?

81.     To show his lack of preparation, Mr. Karceski complained that none of the government witnesses he subpoenaed responded and did not show up. Ms. Pascale pointed out that he didn't subpoena the witnesses correctly [**Exhibit # 1**]. The only witness present was Mrs. Nwoga. Mr. Karceski chose not to cross-examine her, even though she tried to get his attention by raising her hand. Mr. Karceski knew that the evidence the prosecution presented was false. Ms. Pascale's history of misconduct, especially in Mr. Annappareddy's case, raises serious doubts about her trustworthiness and the validity of her claims against Mrs. Nwoga.

82.     The prosecution's case heavily relies on a fabricated anonymous complaint, which triggered an inspection by James Polek and Lisa Ridolfi. Mr. Karceski, being aware of Lisa Ridolfi's dishonesty in Annapareddy's case, indicates the same flawed investigative approach that lacks transparency and accountability and requires revision. Without corroborating evidence, an unsubstantiated anonymous tip should not be the primary basis for serious legal allegations like fraud or processing fraudulent prescriptions for controlled substances. Mr. Karceski was aware that

this practice introduces bias and unverified claims into legal proceedings, undermining fairness and justice but didn't object.

83.     Furthermore, Mr. Karceski's failure to bring Susan Steinberg to the stand to explain her ever-changing story of the anonymous caller exposes his insufficient representation. Steinberg's testimony would have proved that Mrs. Nwoga was not involved with the Methadone clinic. The state's argument is weak without concrete evidence directly linking Mrs. Nwoga to knowingly engaging in fraudulent activities. The absence of direct and irrefutable evidence linking Mrs. Nwoga's misconduct calls into question the prosecution's case and underlying motivations. Any competent defense attorney would have capitalized on this.

84.     Critically, the fact that the Board of Pharmacy and DEA cleared Mrs. Nwoga contradicts the prosecution's allegations, casting a shadow of doubt over the state's entire case. Mr. Karceski's failure to address this critical information suggests a potential bias or a deliberate attempt to manipulate the legal proceedings.

85.     Mr. Karceski knowingly allowed the state to introduce falsified information from an anonymous caller, strengthening the state's case against Mrs. Nwoga. His actions compromise the integrity of the legal process. Rather than challenging the integrity of the evidence presented by the state, Mr. Karceski's behavior highlights a troubling pattern aimed at sabotaging Mrs. Nwoga's case to assist Ms. Pascale in sending another minority pharmacist to prison.

86.     Mr. Karceski had no intention of contesting the allegations or highlighting the prosecution's flawed and potentially prejudiced approach. His actions echo conspiracy.

## The Defence Team's Conspiracy and Fraud

87.     At the heart of this conspiracy is Mrs. Nwoga's representation by Silverman Thompson, a firm unbeknownst to Mrs. Nwoga, that had vested interests in safeguarding the reputations and legal standing of Ms. Pascale and Ms. Lating, the women prosecuting her.

88.     The Defence argued that Mrs. Nwoga was a dedicated and honest pharmacy operator who was unintentionally caught under challenging circumstances. This characterization, however, misrepresents her true nature and professional capabilities. Mrs. Nwoga is not only a seasoned pharmacist but also possesses unquestionable integrity, evidenced by the DEA's recognition of her vigilance in identifying fraudulent prescriptions. Significantly, most of the disputed prescriptions were approved by the DEA's confidential informant, who deceived both Mrs. Nwoga and the DEA

using inside information. Mr. Karceski knew that DEA agent Adams forwarded his investigative report of Antionett Johnson filing fraudulent prescriptions at other pharmacies to Ms. Pascale. **[Exhibit # 16]**

89.    The Defence's promise to present nearly twenty witnesses in support of Mrs. Nwoga's innocence was a testament to the supposed strength of their strategy and the depth of Mrs. Nwoga's support network. Yet, this was a hollow promise, as the most crucial witnesses—meticulously identified by Mrs. Nwoga herself—were conspicuously absent at the trial.

90.    These were not just any witnesses but individuals with the potential to dismantle the prosecution's case by corroborating the truth of Mrs. Nwoga's innocence, shedding light on the integrity of Poplar Grove Pharmacy's operations, and the prosecution's dubious tactics.

91.    The revelation that Mrs. Nwoga's attorneys incorrectly filled out the subpoenas for these vital witnesses is troubling and incredulous. The suggestion that two seasoned lawyers, backed by a century of combined legal experience, could not perform the elementary task of properly issuing subpoenas is preposterous. They intended to tank Mrs. Nwoga's case to protect Ms. Pascale and Ms. Lating.

92.    This situation shows a deliberate sabotage of Mrs. Nwoga's Defence, orchestrated by those who were supposed to advocate for her. It shows collusion with the prosecution, aimed at preventing the truth from emerging and protecting the interests of Ms. Pascale and Ms. Lating at the expense of Mrs. Nwoga's right to a fair trial.

### Darnella Carter

93.    Despite prosecution intimidation, witness Ms. Carter was prepared to testify that Mrs. Nwoga was unknowingly involved in a scheme. Her suppressed testimony, due to the defense's failure to subpoena her, would have exposed manipulation of the legal system and clarified Mrs. Nwoga's lack of involvement in the conspiracy.

DEA confidential informant Antionett Johnson was prepared to testify about fraudulent prescriptions at Mrs. Nwoga's pharmacy, corroborated by DEA agents Adams, Hester, and Stein. Hester would have testified about Nwoga calling to validate prescriptions and hanging up on her upon recognition. Evidence, intended as **Exhibit #2**, also showed Nwoga declining to fill some problematic prescriptions, revealing the extent of the fraud.

### Brent Matthews and the Conflict of Interest Waiver

94.     Mr. Matthews was scheduled to testify in Mrs. Nwoga's Defence but was never called to testify. Instead, the prosecution and Mr. Karceski avoided mentioning his name to protect Silverman Thompson's $40 million payday.  Mrs. Nwoga's lawyers never intended to put him on the stand. [**Exhibit # 3**]

95.     Mr. Karceski and Mr. Schulman's account of their discussions with Mrs. Nwoga regarding the conflict of interest waiver [**Exhibit # 4**] keeps changing. In his answer to the claims in the Attorney Grievance, Mr. Schulman says he met with Mrs. Nwoga about the conflict of interest, but he doesn't remember what was said. In the post-conviction hearing, he testified that he was sure he and Mr. Karceski had told Mrs. Nwoga about the conflict of interest. Both statements can't be factual.

96.     Mr. Karceski states in the Attorney Grievance Commission that he advised Mrs. Nwoga to document their conversation. However, during post-conviction, he claims he only remembers informing her about the conflict of interest and does not mention advising her to report it. He also states that he didn't prepare the Conflict of Interest Waiver until February 1, 2019, when Mrs. Nwoga signed it. His post-conviction testimony contradicts his statements in the Attorney Grievance.

97.     Mr. Karceski states that if Mr. Matthews, the State's main witness, needed to come to the stand, he would avoid the conflict by asking Mr. Schulman to question him. Yet Mr. Schulman said, "I had not done any substantial criminal Defence work in nearly 30 years."

98.     In his answer to the Attorney's Grievance, Mr. Schulman said he was on Mrs. Nwoga's case because of his history with Mrs. Nwoga at the Board of Pharmacy hearing and the pharmacy administrative matters. However, he never told the Court that the Board of Pharmacy said the prescriptions were minor administrative mistakes and that since 2015, Mrs. Nwoga had a perfect record.

99.     Karceski and Schulman initially had conflicting statements about their discussions with Mrs. Nwoga regarding a conflict of interest waiver. Mr. Schulman couldn't recall details at first, but, in a different hearing, claimed that, without a doubt, he had discussed it with Mrs. Nwoga.

100.    Mr. Karceski also changed stories, initially saying he told the Court it was Mrs. Nwoga's responsibility to document their conversation but later left out this detail in another hearing. The timing of preparing the Conflict of Interest Waiver added to the confusion, as Mr. Karceski admitted it was done on the same day it was signed, contradicting his earlier certainty.

101.    It's incredibly telling how certain they were about Mrs. Nwoga's need to sign a conflict of interest waiver. This insistence was wielded as a shield, a stout Defence against accusations of inadequate representation in both an attorney grievance answer and their post-conviction testimony.

102.    Their anger at the mere suggestion of impropriety speaks volumes. With over a century of combined legal experience and sterling reputations within Maryland's legal community, they positioned themselves as paragons of legal ethics, ostensibly beyond the reach of doubt.

103.    Yet, this meticulously crafted veneer of integrity crumbles under the weight of a glaring omission. The failure to disclose their representation of Ms. Lating and Ms. Pascale. Labeling such a significant lapse as a mere oversight stretches the bounds of credibility to its breaking point. It's not just laughable; it's repugnant.

104.    In essence, the insistence on a conflict of interest waiver for Mr. Matthews, juxtaposed with the concealment of their representation of Ms. Lating and Ms. Pascale, demonstrates that they knew the dual representation of the prosecution and Defence was unlawful, so they hid it from Mrs. Nwoga. Ms. Pascale, Mr. White, Mr. Silverman, Mr. Karceski, and Mr. Schulman knew about the conspiracy to steal over $136,000 from Mrs. Nwoga under the guise that they represented her. They all knew about their plan to defraud her by making her believe that over $136,000 would get her the best Defence possible.

105.    The argument that merely being part of the team representing Ms. Pascale and Ms. Lating doesn't constitute direct representation needs to be revised and made more accurate. The Defence's assertion that their involvement was peripheral and inconsequential to Mrs. Nwoga's case is absurd and dangerously deceptive.

106.    To suggest that their role in the team was benign or irrelevant completely disregards the weight of collective responsibility and the integral part they played in shaping the legal strategy against Mrs. Nwoga. Mr. White's contribution in writing the brief and Ms. Buchman's role in arguing it are not minor tasks; they are substantial contributions that directly impact the case's direction and outcome. Claiming otherwise is not just disingenuous; it's an overt attempt to obscure their significant involvement.

107.    Furthermore, the issue of the conflict of interest waiver signed for Mr. Matthews while simultaneously concealing their representation of Ms. Lating and Ms. Pascale is a glaring indication of deceit. If their representation of Ms. Lating and Ms. Pascale was as innocuous as they claim, why was there a deliberate omission?

108.    The necessity to emphasize the waiver for Mr. Matthews, juxtaposed with the concealment of their representation of Ms. Lating and Ms. Pascale, shows their malicious attempt to conspire to defraud Ms. Nwoga, who stole over $136,000 from her.

109.    The argument that their representation of Ms. Lating had no bearing on Mrs. Nwoga's case falls flat when one considers Ms. Lating's actions in shredding key evidence in Mr. Annappareddy's case at the behest of the prosecutors. To claim that such a person's representation is unrelated or inconsequential to Mrs. Nwoga's case is not only implausible but laughable. There was a concerted effort to manipulate the legal proceedings to Mrs. Nwoga's detriment.

110.    The Defence's attempts to downplay their representation of Ms. Pascale as "mere team members" and dismiss the significance of the conflict of interest waiver are unconvincing; they indicate a deliberate strategy to deceive and defraud Mrs. Nwoga. The audacity to assert such arguments only underscores the lengths to which they are willing to go to obfuscate their role in conspiring to steal over $136,000 and defraud an innocent woman. It's despicable.

### The Email Proving Ms. Pascale and Karceski Were Conspiring

111.    After Mrs. Nwoga was released from prison, she reviewed her case file. Mrs. Nwoga found an email dated January 29, 2019, from Mr. Karceski to Ms. Pascale. It read:

112.    From Karceski to Pascale - " Ms. Pascale: Concerning the subpoena to you, to repeat, you are not a witness. I was only requesting informant information regarding Ms. Antoinette Johnson." **[Exhibit # 5]**.

113.    Karceski mistakenly subpoenaed Ms. Pascale, overlooking prior advice from his firm to avoid such action. Upon recognizing his mistake, he promptly retracted Ms. Pascale's subpoena. An email from the 29th of January 2019 reveals Mr. Karceski's earnest apology to Ms. Pascale, in which he reassures her that their misconduct—falsifying evidence and destroying documents—would remain concealed. Ms. Pascale and Mr. Karceski were acutely aware that revealing their firm's simultaneous representation of both prosecution and Defence would be detrimental. In one of the most horrifying acts in this conspiracy and proof of their knowledge of RICO violation, after Mrs.

Nwoga discovered her attorney's malfeasance, so she fired her attorneys. Ms. Pascale filed a motion to prevent Mrs. Nwoga from firing her attorneys **[Exhibit # 15],** because when Mr Annappraddy hired a new attorney, the new attorney uncovered their destruction of evidence, fake accounting records, forged affidavit, and so much more. They could not let Judge Russell or the fourth Circuit know what they were doing to Mrs. Nwoga because they were telling the fourth Circuit that Mr. Annapperreddy was an isolated error; that is how Ms.Pascale got the fourth Circuit to overturn the loss of her immunity. They gave her immunity based on her lie. STSW was on the team representing Pascale. She could not lose STSW protection.

114.    Additionally, Silverman Thompson's firm, representing Ms. Lating—the individual responsible for shredding documents in Annappareddy's case—played a significant role in Ms. Pascale's Defence team. Silverman Thompson's firm, representing Ms. Lating—the person who shredded documents in Annappareddy's case—also significantly participated in Ms. Pascale's Defence team.

115.    According to Pascale, on Friday, Jan. 11, 2019, she received a report from DEA TFO Glen Hester. It reads, "Hester stated that Ms. Nwoga showed him a binder containing prescriptions that she identified as 'bad." Hester also stated that previously (year unknown), the DEA utilized a confidential source, who presented a prescription to Poplar Grove (created by the DEA for the investigation) for alprazolam...Nwoga did not fill the prescription ...There was no written report generated".[**Exhibit # 2**]

116.    That notion that 'The DEA generated no report' should be laughable to any Defence attorney as experienced as Mr. Karceski and Mr. Schulman.  Mr. Karceski was compelled to prevent any witnesses from testifying on Mrs. Nwoga's behalf, ensuring the concealment of their unethical practices.

117.    Mr. Karceski's actions betrayed an apparent conflict of interest, prioritizing Ms. Pascale over Mrs. Nwoga despite understanding the gravity of Mrs. Nwoga's innocence. His correspondence with Ms. Pascale, particularly the email assuring her, "About the subpoena to you, to repeat, you are not a witness, (**Exhibit #5** ), reveals not just an emphasis but an urgency underscored by Ms. Pascale's apparent frustration. This interaction hints at Mr. Karceski's willingness to sideline justice to maintain allegiance with Ms. Pascale, even if it meant risking Mrs. Nwoga's freedom.

118.    The phrase "to repeat" is reserved for moments requiring reinforcement, suggesting Ms. Pascale's intense reaction to the possibility of being a witness. This exchange uncovers Mr. Karceski's unsettling readiness to defend Ms. Pascale at all costs, even when faced with Mrs. Nwoga's evident innocence. It illustrates a disturbing scenario where Mr. Karceski would rather see Mrs. Nwoga wrongfully convicted than compromise his relationship with Ms. Pascale and Ms. Lating.

119.    Furthermore, the notion that a prosecutor would inquire about a witness's status in a case they're prosecuting is highly irregular and initially perplexing. However, uncovering Ms. Pascale's email post-incarceration shed light on the matter, exposing Mr. Karceski's manipulation of the case to protect Ms. Pascale, thereby implicating him in prosecutorial misconduct and confirming their conspiracy.

120.    This misconduct extends to the upper echelons of Maryland's legal system, as evidenced by another email from Eleanor Dayhoff-Branigan, Assistant Attorney General of Maryland, to Mr. Karceski, dated February 1, 2019 [**Exhibit #6**]. The email states, "Per our conversation on January 29, 2019, you have agreed that if documents are unavailable or provided to your office, the Agencies are excused from sending a witness for the trial." We suspect the State shredded evidence and hid witnesses to meet this obligation.

121.    This correspondence reveals a conspiracy between the Assistant Attorney General and Mr. Karceski. Mr. Karceski agreed to forgo calling a potentially exonerating government witness, sealing Mrs. Nwoga's fate. This is a glaring example of how Mr. Karceski was prepared to protect Ms. Pascale, sacrificing Mrs. Nwoga's innocence and right to a fair trial.

### No Forensic Accountant and Sloppy Record-Keeping

122.    Mrs. Nwoga repeatedly requested that Mr. Karceski hire a forensic accountant to scrutinize her financial records and juxtapose them with the documents Ms. Pascale presented to the court. Mrs. Nwoga harbored suspicions that James Polek and Lisa Ridolfi manipulated the records submitted by Ms. Pascale, just as they had done in Mr. Annappereddy's case. A thorough comparison by a forensic accountant of Mrs. Nwoga's actual financial records against those presented by Ms. Pascale would have undeniably demonstrated the fabrication of financial documents by Ms. Pascale.

123.    Aware of Ms. Pascale and Ms. Lating's notorious history of disorganized record-keeping, Mr. Karceski nonetheless declined to summon a forensic accountant or any witness who might aid the Defence, fearing such testimonies could expose Ms. Pascale's malfeasances. Surprisingly, Mrs. Nwoga was the sole witness to testify on behalf of the Defence during her trial, despite the potential for government witnesses to exonerate her. Mr. Karceski's refusal to cross-examine or present critical evidence seemed inexplicable at the time. However, as the email above demonstrates, his actions were driven by his conspiracy with Pascale.

### Susan  Steinberg and Desia Holt

124.    On August 5, 2015, Ms. Steinberg claimed she received a call from an anonymous caller. [**Exhibit # 7**].  However, on 3/21/2016, Ms. Steinberg stated in her email to Ilene Nathan, Executive Dir. Medicaid Fraud Unit Control, Office of Attorney General, stated that "the case was referred to her by the Division of Drug Control".  A significant point of contention arose from her testimony on September 16, 2016, specifically on page 149, lines 19-21, Steinberg: "I believe they (DDC) got the allegation through Office of  Health Care Quality,". But Polek's testimony [**Exhibit #8**], stated the referral was from Ms. Steinberg. Yet, in light of Mr. Polek and Ms. Steinberg's conflicting testimonies, Mr. Karceski did not ensure Ms. Steinberg appeared as a witness for questioning.

125.    Despite a prior agreement, "Shopping List" [**Exhibit #9** ] reached on May 18, 2018, regarding the release of Ms. Holt's documentary statement report by Mr. Edward J. Fox's office (Maryland Board of Professional Counselors and Therapists- BOPC), action still needs to be taken. The failure of  Mr. Karceski to secure Ms. Holt's statement, the hindering of the engagement of private investigators, and the potential exposure of Steinberg's perjury are evidence of his conspiracy.

126.    Additional complications emerged, including allegations that Ms. Steinberg had provided false information about receiving calls from Desia Holt.  On March 16, 2019, Mrs. Nwoga's husband interviewed Desia Holt in her parking lot in Reisterstown, Maryland. Mr. Nwoga passed the interview report on to Mr. Karceski. This interview was part of ongoing investigations on a complex case detailed in various exhibits and testimonies [**Exhibit # 10**]

127.    These allegations could have been addressed by reviewing the hotline phone log, as Ms. Holt's contact details were known. Accusations also targeted Ms. Steinberg for dishonesty in an

affidavit and for providing misleading information during her testimony at the Office of Administrative Hearings (OAH).

128.    Based on Ms. Steinberg's testimony on Sept. 16, 2016, Ms. Steinberg did not "personally receive" the call on 8/5/2015 that initiated the criminal investigation. She fabricated the email to incriminate Mrs. Nwoga. As a result, Mr. Schulman filed a tort claim against Ms. Steinberg and Mr. Polek on April 18, 2017.

129.    Despite the agreement on the documents to be subpoenaed (Shopping List) that was created on May 18, 2018, Mr. Fox's office (BOPC) did not release Ms. Holt's documentary statement report, and Mr. Karceski failed to obtain Ms. Holt's statement, which impeded efforts to secure additional evidence. This is another part of the conspiracy.

130.    This omission highlights a missed opportunity to disprove Ms. Steinberg's claim of not receiving calls from Desia Holt by checking the hotline's phone log. Furthermore, Ms. Steinberg's intentions to testify about drafting an email complaint in August 2015 concerning a Methadone clinic and her expected confirmation of the complaint being a recorded hotline message would have further demonstrated discrepancies in her affidavit.

131.    Ultimately, Ms. Holt was prepared to testify that she had not communicated with Ms. Steinberg in 2015. According to Ms. Holt, investigators, including Ed Fox and Tracee Deshield, contacted her. Ms. Holt had only spoken to these investigators, and they had her written statement, which Karceski deliberately ignored.

**Defendants Admit Conflict of Interest and Lie to Judge Shar**

132.    STSW committed legal malfeasance by representing both the prosecution and the Defence simultaneously. This violates legal standards and is blatant malfeasance. In a sworn statement, Todd Hessel admitted that STSW knew about this conflict of interest. Mr. Hessel said Mr. Karceski didn't tell Ms. Nwoga about the conflict because prosecutors Catherine Pascale and Tracee Fruman said they would.

133.    During Ms. Nwoga's trial, Judge Shar noticed something was off in my case. He asked them if there was a conflict of interest. Mr. Karceski, who represented STSW, lied and said No. **[Exhibit #1: Pg 16 line 19-21]** This is legal malfeasance.

134.    Mr. Karceski states he is a legal expert and understands the Importance of Conflicts of Interest and Waivers. Someone from STSW attended Ms. Nwoga's post-conviction hearing, where Mr. Karceski stressed the importance of my signing a waiver for Brett Matthews' conflict of interest.

If he knew avoiding conflicts was necessary, why didn't he ask me to sign similar waivers for Maura Lating and Catherine Pascale? This is malfeasance.

### STSW and Wright, Constable & Skeen Lied to Judge Shar During the Trial

135.    During Ms. Nwoga's trial, Judge Shar questioned the legal representatives about a potential conflict of interest. Mr. Karceski, representing STSW, stated no conflict of interest existed.

136.    Mr. Karceski required Mrs. Nwoga to sign a waiver for a conflict involving Brent Matthews and acknowledged the importance of conflict of interest waivers during a post-conviction hearing. However, STSW did not seek similar waivers for Maura Lating or Catherine Pascale. This inconsistency demonstrates a deliberate failure to address and mitigate conflicts of interest.

### Missing Police Report and Record of Mrs. Nwoga's Incarceration at the Baltimore City Jail.

137.    After Mrs. Nwoga was released from prison, she tried to get the official police report about her arrest by the Baltimore City police. Despite spending a significant amount of time in the Baltimore City correctional system, Baltimore City police told her that there was no record of her arrest at all. The officers even questioned whether she had been imprisoned.

138.    The lack of any arrest record raises serious questions about Mr. Kareceski, the lawyer responsible for Mrs. Nwoga's defense. A critical part of defending someone in a criminal case is gathering key evidence, and the police report about the arrest is crucial for understanding the charges and circumstances. The fact that Mr. Kareceski did not make any effort to obtain this vital document shows an apparent failure in his duty, pointing to legal malfeasance.

139.    Within the state prison environment, other inmates, operating under the mistaken assumption that she was incarcerated for a federal crime, believed she was an informant. Mrs. Nwoga's safety and well-being were seriously at risk during her time in state prison because she was supposed to be in a federal prison.

140.    Her case raises important questions for her defense team. First, why was she held in a state prison when her crime should have been handled at the federal level? Second, there is no police report or official record of her arrest and detention in Baltimore City, which is unusual and needs quick clarification. The DEA report documenting her innocence "disappeared." The Baltimore City police did not investigate her; instead, the DEA investigated her. The DEA and the Baltimore Police have no records of her being charged or arrested.

## CAUSES OF ACTION

### 18 U.S.C. § 1341 (Mail Fraud)

141.    STSW and WCS developed a scheme to defraud Mrs. Nwoga by concealing a conflict of interest, misrepresenting their services, and charging excessive legal fees. This scheme involved using the U.S. Postal Service (e.g., sending bills, correspondence) and electronic communications (e.g., emails, phone calls), constituting mail and wire fraud. STSW and WCS sent fraudulent billing statements through mail and email as part of their scheme to overcharge Mrs. Nwoga, which was a direct violation of federal law. Over 100 emails discuss concealing the conflict of interest, which is wire fraud.

142.    Howard Schulman claimed he had 50 years of legal experience but failed to mention that it didn't include criminal experience. Mr. Schulman committed mail fraud in furtherance of a conspiracy to conceal his lack of criminal lawyer experience.

143.    Mrs. Nwoga meets the criteria for materiality held in *Neder v. United States, 527 U.S. 1 (1999)*: This case established that "materiality" is an element of mail and wire fraud. The false or fraudulent statements must be material (essential) to the victim's decision-making. Hiding a significant conflict of interest is material.

144.    *United States v. Pearlstein\*, 576 F.2d 531 (3d Cir. 1978)* clarified that the use of mail or wires does not need to be the central part of the scheme; it only needs to be incidental to an essential part. Even if the mailings or emails were secondary, they could still establish mail or wire fraud.

145.    The concealment of the conflict of interest was material because it significantly impacted Mrs. Nwoga's decision to retain STSW and WCS as her legal counsel. A reasonable person would likely consider it important to know if their law firm had a conflicting interest that could compromise their defense.

146.    An example of a material action involving mail fraud is sending billing statements that did not disclose the conflict of interest. These statements misrepresented the fees' legitimacy, as they were incurred while STSW and WCS operated under a concealed conflict. This misrepresentation was material because it induced Mrs. Nwoga to pay for services she might not have agreed to had she been aware of the conflict. Using the U.S. Postal Service was integral to executing this fraudulent scheme. Specifically, STSW transmitted correspondence related to their representation through the mail. These mailings were not merely incidental; they served to further the scheme by

demanding payment for services rendered under pretenses and perpetuating the misrepresentation of their loyalty and representation. As established in Neder v. United States, 527 U.S. 1 (1999), the concealed conflict of interest was undoubtedly material to Mrs. Nwoga's decision-making regarding legal counsel. The act of sending these misleading documents through the mail, as clarified in United States v. Pearlstein, 576 F.2d 531 (3d Cir. 1978), satisfies the requirement that the mailings be incidental to an essential part of the fraudulent scheme.

## 18 U.S.C. § 1343 (Wire Fraud)

147.    STSW and WCS executed a scheme to defraud Mrs. Nwoga, violating federal wire fraud statutes. This scheme involved deliberately concealing a significant conflict of interest, misrepresenting their capability to provide effective legal representation, and imposing excessive legal fees, all while actively undermining Mrs. Nwoga's legal defense.

148.    The scheme relied extensively on electronic communications. STSW and WCS used email and telephone calls to communicate with Mrs. Nwoga, discuss her case details, and transmit billing information. Crucially, these electronic communications perpetuated the fraudulent concealment of the conflict of interest and misrepresented the nature of their representation. The numerous emails exchanged by STSW and WCS discussing and concealing this conflict constitute direct acts of wire fraud. Like mail fraud, these electronic communications were instrumental in maintaining the deceptive narrative and extracting excessive fees from Mrs. Nwoga.

149.    The materiality of the concealed conflict, as established in *Neder v. United States, 527 U.S. 1 (1999)*, applies unequivocally to these wire fraud violations, as it directly impacted Mrs. Nwoga's decision-making regarding legal counsel. These electronic means were not merely incidental but directly furthered the scheme to defraud, satisfying the requirements of *18 U.S.C. § 1343*.

150.    Howard Schulman misrepresented his legal experience by claiming 50 years without disclosing his lack of criminal law experience. This misrepresentation constitutes an additional act of wire fraud as it was communicated electronically to further the conspiracy and conceal his unsuitability for the case.

151.    STSW and WCS defrauded Mrs. Nwoga by concealing a conflict of interest, misrepresenting their representation, and charging excessive legal fees. This scheme involved using electronic communications (e.g., emails, phone calls), constituting wire fraud. STSW sent fraudulent billing statements via email as part of their scheme to overcharge Mrs. Nwoga, which was a direct

violation. Over 100 emails demonstrate the discussion and concealment of the conflict of interest: wire fraud.

152.    Mrs. Nwoga meets the criteria for materiality as defined in *Neder v. United States, 527 U.S. 1 (1999)*, where the Supreme Court established that "materiality" is an essential element of mail and wire fraud. The false or fraudulent statements must be material (important) to the victim's decision-making. STSW's concealment of a significant conflict of interest was undoubtedly material to Mrs. Nwoga's decision to retain their services.

153.    *United States v. Pearlstein, 576 F.2d 531 (3d Cir. 1978)*, clearly established that the use of mail or wires does not need to be the central part of the scheme; it only needs to be incidental to an essential part. Even if the emails were secondary to other aspects of the scheme, their use to further the fraudulent concealment establishes wire fraud.

154.    The concealment of the conflict of interest by STSW was material because it significantly impacted Mrs. Nwoga's decision to retain them as her legal counsel. A reasonable person would deem it crucial to know if their law firm harbored a conflicting interest that could compromise their defense.

155.    STSW's and WCS's material action involving wire fraud includes sending billing statements via email that did not disclose the conflict of interest. These statements misrepresented the fees' legitimacy, as they were incurred while STSW operated under a concealed conflict. This misrepresentation induced Mrs. Nwoga to pay for services she would not have agreed to had she been aware of the conflict. The use of electronic communication was integral to the execution of this fraudulent scheme.

156.    Specifically, STSW transmitted fraudulent billing statements and other correspondence related to their representation via email. These electronic communications furthered the scheme by demanding payment for services rendered under pretenses and perpetuating the misrepresentation of their loyalty and representation. As established in *Neder v. United States, 527 U.S. 1 (1999)*, the concealed conflict of interest was undoubtedly material to Mrs. Nwoga's decision-making regarding legal counsel. The act of sending these misleading documents electronically, as clarified in *United States v. Pearlstein, 576 F.2d 531 (3d Cir. 1978)*, satisfies the requirement that the wire communications be incidental to an essential part of the fraudulent scheme.

### III. 18 U.S.C. §§ 1961-1968 (RICO)

157.    STSW engaged in a series of acts that constitute a "pattern of racketeering activity" under RICO, fulfilling the requirement of at least two predicate acts:

158.    **Mail Fraud (18 U.S.C. § 1341):** STSW and WCS used the U.S. Postal Service to send correspondence to Mrs. Nwoga. These statements were part of the scheme to defraud as they concealed the conflict of interest and demanded payment for services rendered under pretenses. Sending these misleading documents through the mail is a predicate act of mail fraud.

159.    **Wire Fraud (18 U.S.C. § 1343):** STSW communicated with Mrs. Nwoga using electronic communications, including emails and phone calls. These communications included assurances of loyalty while concealing the conflict of interest and transmitting billing information. These electronic communications perpetuated the fraudulent concealment of the conflict and misrepresented the nature of their representation, thus fulfilling the requirements of wire fraud.

160.    The repeated act of sending fraudulent correspondence through mail and utilizing electronic communications to further the fraudulent scheme constitutes at least two predicate acts of mail and wire fraud. These acts are related as they are part of a single scheme to defraud Mrs. Nwoga by concealing a conflict of interest and overcharging legal services. This establishes a "pattern of racketeering activity" per *H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989)*, which defines the pattern requirement as related predicate acts that amount to or threaten continued criminal activity.

161.    The "enterprise" in this case is the law firm STSW and WCS. The connection between the pattern of racketeering activity and the enterprise is straightforward:

162.    STSW and WCS are the entities through which the fraudulent activities were conducted. The firm provided the platform and resources used to carry out the scheme. As per *United States v. Turkette, 452 U.S. 576 (1981)*, an "enterprise" for RICO purposes can be either a legitimate or illegitimate entity, and the law firm STSW can be considered an "enterprise."

163.    The mail and wire fraud activities were conducted in the normal course of STSW's and WCS's business. The correspondence was sent as part of their standard communication practice, and electronic communications were used to manage client relationships and discuss the case, all core functions of a law firm.

164.    The fraudulent scheme directly benefited STSW and WCS by allowing them to collect excessive legal fees from Mrs. Nwoga while concealing a material conflict of interest. This financial gain directly connects the racketeering activity and the enterprise.

165.    H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989): This case clarifies the "pattern" requirement under RICO, stating that it requires at least two related predicate acts that amount to or pose a threat of continued criminal activity.United States v. Turkette, 452 U.S. 576 (1981): This case held that the "enterprise" for RICO purposes can be either a legitimate or illegitimate one. The law firm STSW could potentially be considered an "enterprise."

### IV. Violation of Consumer Protection Principles

166.    While no single federal statute explicitly governs consumer protection in attorney-client relationships in the same way as for the sale of goods, well-established principles of fiduciary duty and legal ethics, coupled with the broad aims of consumer protection, provide a strong legal basis to prove that STSW's and WCS's actions violated these principles.

167.    Attorneys owe their clients a fundamental fiduciary duty, encompassing the obligations of honesty, loyalty, confidentiality, and diligent representation. This duty is recognized under state law and is the cornerstone of the attorney-client relationship. Failure to uphold this duty can be seen as a violation of the trust inherent in this relationship, aligning with the core tenets of consumer protection—ensuring fair dealing and preventing deception.

168.    While primarily disciplinary in nature, state bar rules, such as those governing conflicts of interest (Model Rule 1.7) and communication with clients (Model Rule 1.4), reflect the profession's understanding of its obligations to clients. Violations of these rules can serve as evidence of conduct that undermines consumer protection principles in the legal context.

169.    Federal courts possess inherent supervisory power over attorneys admitted to their bar. This power allows courts to address attorney misconduct that falls short of the ethical standards expected in the legal profession, which can extend to breaches of fiduciary duty that harm clients.

170.    STSW and WCS' actions, as described, demonstrate a failure to uphold the fiduciary duties owed to Mrs. Nwoga, thereby violating the principles of consumer protection in the attorney-client context:

171.    The concealment of a significant conflict of interest directly undermined Mrs. Nwoga's ability to make an informed decision about retaining WCS and STSW. A reasonable consumer of legal services would consider knowledge of a conflict of interest crucial in deciding who to entrust with their legal defense. This failure to disclose constitutes a breach of the duty of honesty and loyalty, as STSW and WCS prioritized their interests (or those of other clients/attorneys) over Mrs.

Nwoga's right to conflict-free representation. This lack of transparency directly contravenes the principle that consumers are entitled to material information necessary for making informed decisions.

172.    *Attorney Grievance Comm'n of Maryland v. McClain*, 373 Md. 196, 211 (2003) (emphasizing that an attorney's fiduciary duty includes the duty of loyalty and confidentiality, and that a conflict of interest can compromise these duties). While a state disciplinary case, it highlights the fundamental nature of these duties in the attorney-client relationship.

173.    The claim that Howard Schulman misrepresented his legal experience (claiming 50 years without disclosing the lack of criminal experience) constitutes a misrepresentation of a material fact relevant to Mrs. Nwoga's decision to hire STSW and WCS for a criminal matter. Consumers of services are entitled to truthful representations about the service provider's qualifications and expertise. This misrepresentation directly violates the principle of honesty and fair dealing.

174.    Charging Mrs. Nwoga excessive legal fees while operating under a concealed conflict of interest and undermining her defense constitutes unjust enrichment and further violates consumer protection principles. Consumers expect to pay reasonable costs for competent and loyal representation. Charging substantial fees under circumstances where the attorney's loyalty is compromised and the representation is potentially ineffective is unfair and deceptive.

175.    While not directly a "consumer protection act" case, *Fassihi v. Sommers*, 107 Nev. 109, 114 (1991) discusses attorney malfeasance and breach of fiduciary duty. The case notes that attorneys must act with the utmost good faith and fair dealings towards their clients. Charging excessive fees under questionable circumstances can be seen as a breach of this duty.

176.    STSW and WCS' actions meet the broad consumer protection principles criteria: There is a significant power and information imbalance between an attorney and a client. Clients rely on the attorney's expertise and honesty. Failure to disclose a conflict of interest exploits this asymmetry, preventing the client from making an informed decision.

177.    Legal clients are often in vulnerable situations, facing significant legal challenges. They place immense trust in their attorneys. Exploiting this vulnerability through concealed conflicts and misrepresentations is a hallmark of unfair practices that consumer protection aims to prevent.

178.    The concealed conflict of interest and misrepresentation of experience were undoubtedly material to Mrs. Nwoga's decision-making process. A reasonable person would consider this information crucial in selecting legal counsel.

179.    Mrs. Nwoga suffered financial harm through excessive fees and detriment to her legal defense due to the concealed conflict and lack of suitable expertise. While a specific federal "Consumer Protection Act" for legal services may not exist, the principles of fiduciary duty, legal ethics, and the inherent supervisory power of the courts provide a strong legal framework proving STSW and WCS violated fundamental consumer protection principles in its relationship with Mrs. Nwoga.

180.    Failure to disclose a material conflict of interest, misrepresentation of legal experience, and charging excessive fees under these circumstances constitute breaches of the duties of honesty, loyalty, and fair dealing, directly contravening the expectations of a consumer of legal services.

### 18 U.S.C. § 1001 - False Statements

181.    STSW and WCS demonstrably violated 18 U.S.C. § 1001 by making materially false statements within the federal government's jurisdiction. Ms. Nwoga was charged with Medicaid fraud, a federal crime. Mr. Karceski's denial of a conflict of interest to Judge Shar, documented in **Exhibit #1 (pg 16, lines 19-21),** directly violates this statute.

182.    This statement was unequivocally false because STSW and WCS actively concealed a significant conflict of interest from Mrs. Nwoga as part of a documented mail and wire fraud scheme. This concealment, which formed the basis of their fraudulent activities, proves the existence of the conflict Mr. Karceski denied.

183.    The denial was material under *United States v. Gaudin* because a conflict of interest would undoubtedly impact judicial proceedings and Mrs. Nwoga's legal representation. Knowledge of such a conflict would be crucial for the court's assessment of the proceedings' integrity and Mrs. Nwoga's understanding of potential biases affecting her defense. Mr. Karceski's direct denial actively misled the court on a central matter. Moreover, *Brogan v. United States* eliminates any "exculpatory no" defense; a simple denial of a material fact within federal jurisdiction is prosecutable under § 1001. The documented evidence of the concealed conflict directly contradicts Mr. Karceski's statement, legally proving its falsity and establishing a clear violation of 18 U.S.C. § 1001.

184.    STSW and WCS engaged in conduct demonstrably violating 18 U.S.C. § 1001, a federal statute criminalizing materially false statements within federal jurisdiction. The specific violation is Mr. Karceski's denial of a conflict of interest to Judge Shar, meticulously documented in Exhibit #1, page 16, lines 19-21. This denial directly contravenes § 1001's explicit language and intent.

185.    Mr. Karceski's assertion to Judge Shar, explicitly denying any conflict of interest, was unequivocally false. The comprehensive scheme of mail and wire fraud by STSW and WCS, substantiated by extensive documentation, reveals a deliberate and sustained effort to conceal a significant conflict of interest from Mrs. Nwoga. This concealment was the foundational basis of their fraudulent activities. STSW and WCS actively worked to prevent Mrs. Nwoga from knowing about this conflict, irrefutably proving its existence and directly contradicting Mr. Karceski's sworn statement.

186.    The materiality of Mr. Karceski's false statement is crucial under § 1001. *United States v. Gaudin* established that a statement is material if it can influence the decision of the addressed body. In judicial proceedings, a conflict of interest is undoubtedly material. Knowledge of it is paramount for the judge to assess fairness and for Mrs. Nwoga to understand potential biases affecting her defense strategy. Mr. Karceski's direct denial actively misled the court on matters central to the case's impartiality and legal counsel's adequacy. By concealing this, STSW and WCS aimed to prevent scrutiny and maintain their fraudulent scheme.

187.    Furthermore, *Brogan v. United States* eliminated the "exculpatory no" defense for false statements to federal authorities. Even a simple denial of a material fact under federal jurisdiction is prosecutable under § 1001. Mr. Karceski's direct denial of a conflict falls squarely within this prohibition. There is no legal basis to claim it was merely avoiding self-incrimination. The documented evidence of the concealed conflict irrefutably proves the falsity of Mr. Karceski's statement. This evidence legally establishes a material false statement within federal jurisdiction, an unambiguous violation of *18 U.S.C. § 1001*. The deliberate concealment and direct contradiction between Mr. Karceski's statement and the documented facts leave no doubt about this federal crime.

188.    STSW and WCS demonstrably transgressed *18 U.S.C. § 1001*, prohibiting false statements within federal authority. The specific infraction is Mr. Karceski's explicit denial of a conflict of interest to Judge Shar, meticulously chronicled in Exhibit #1, page 16, lines 19-21. This denial directly affronts *§ 1001's* clarity and intent, a significant federal law violation.

189.    Mr. Karceski's sworn assertion to Judge Shar, unequivocally stating no conflict of interest existed, was fundamentally and demonstrably false. The intricate and pervasive mail and wire fraud scheme by STSW and WCS provides irrefutable evidence. The comprehensive documentation details a deliberate and sustained campaign to conceal a substantial conflict of interest from Mrs. Nwoga. This concealment was not incidental but the bedrock of their fraudulent activities. STSW

and WCS's proactive measures to keep Mrs. Nwoga unaware of this critical conflict are compelling and undeniable proof of its existence, directly and unequivocally contradicting Mr. Karceski's sworn testimony, striking at the heart of the judicial process and undermining transparency and fairness.

190.    The materiality of Mr. Karceski's false statement is critical under § 1001. *United States v. Gaudin* established that a statement is material if it can influence the decision-making of the addressed entity. In judicial proceedings, a conflict of interest is unequivocally material. Knowledge of it is paramount for the judge to assess the proceedings' integrity and impartiality. Mrs. Nwoga's awareness of potential biases affecting her legal representation is equally critical for informed strategic decisions and ensuring undivided loyalty from her counsel. Mr. Karceski's direct denial actively and deliberately misled the court on a matter central to the case's fairness and the adequacy of Mrs. Nwoga's legal counsel. By actively concealing this crucial information, STSW and WCS sought to shield their actions from scrutiny and perpetuate their fraudulent scheme without the risk of exposure due to the undisclosed conflict, directly furthering their illicit activities.

191.    STSW and WCS thwarted all efforts of the private investigator Mr. Joe Nwoga, the plaintiff's husband hired.

192.    *Brogan v. United States* eliminated the "exculpatory no" defense regarding false statements to federal authorities under *§ 1001*, meaning even a simple denial of a material fact under federal jurisdiction is prosecutable. Mr. Karceski's direct denial of a conflict of interest violates this statute, and the documented evidence of the concealed conflict irrefutably proves the falsity and materiality of his statement within federal jurisdiction, a violation of *18 U.S.C. § 1001*. Separately, after discovering the conflict related to Brent Matthews, Mrs. Nwoga attempted to hire new counsel. Still, the defendants falsely claimed she could not find a lawyer quickly and actively interfered with her efforts to terminate their representation. They further obstructed her by filing what she termed a "ridiculous motion" with the court, seemingly to protect their conflicting interests.

193.    The deliberate concealment, coupled with the direct and irreconcilable contradiction between Mr. Karceski's sworn statement and the documented facts, leaves no reasonable doubt as to this serious federal crime by Silverman Thompson and WCS, demonstrating a willful disregard for the judicial system's integrity and a clear violation of federal law intended to prevent such deceptive conduct. Evidence: **[Exhibit #1: Pg 16 line 19-21]** documents Mr. Karceski telling Judge Shar there was no conflict of interest.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing egregious conduct and the profound damages suffered, Plaintiff Mrs. Nwoga respectfully requests that this Honorable Court enter judgment against Defendants, jointly and severally, and grant the following relief:

1. **Compensatory Damages:** For compensatory damages in a sum to be determined at trial, which accurately and fully reflects the totality of losses sustained by Mrs. Nwoga as a direct and proximate result of the Defendants' negligent and fraudulent actions. Such losses include, but are not limited to:

2. **Financial Losses from Business Collapse:** Comprehensive compensation for the complete collapse of Mrs. Nwoga's established and thriving pharmacy business, including but not limited to lost profits (past and future), the diminished value of the business, the costs associated with its closure, and any outstanding liabilities incurred as a result of the Defendants' misconduct.

3. **Damages for Thwarted Expansion Plans:** Full restitution for the significant financial investments made and opportunities lost due to the Defendants' actions that directly prevented Mrs. Nwoga from proceeding with her carefully planned and potentially lucrative expansion initiatives. This includes, but is not limited to, lost projected revenues, sunk costs associated with the expansion efforts, and damages for the frustration of business expectations.

4. **Consequential Damages:** Compensation for all other foreseeable and direct consequential damages arising from the Defendants' actions, including but not limited to damage to Mrs. Nwoga's personal and professional reputation, emotional distress, and any additional financial burdens.

5. **Punitive Damages:** Mrs. Nwoga respectfully requests an award of punitive damages in a significant amount sufficient to effectively deter the Defendants and others similarly situated from engaging in such willful, malicious, reckless, and fraudulent conduct in the future. The Defendants' actions, which directly and foreseeably caused the demise of Mrs. Nwoga's business and deprived her of substantial economic opportunities, demonstrate an apparent disregard for her rights and warrant the imposition of punitive damages to serve as a powerful deterrent and to reflect the gravity of their wrongdoing.

6. **Other Relief:** Finally, Mrs. Nwoga respectfully seeks any other legal and equitable relief that this Honorable Court deems just and appropriate under the circumstances, including but not limited to

legal representation,prejudgment and post-judgment interest, and any orders necessary to compensate Mrs. Nwoga for the harm she has suffered fully and to prevent further damage.


Very truly,

SUSAN I. NWOGA
14908 Meanderwood Lane, Burtonsville, MD 20866
443-955-3081
Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on Monday, May 5, 2025, a true and correct copy of the foregoing complaint for *Mail Fraud (18 U.S.C. § 1341), Wire Fraud (18 U.S.C. § 1343), Racketeer Influenced and Corrupt Organizations Act (RICO) violations (18 U.S.C. §§ 1961-1968), Violation of Consumer Protection Principles in Attorney-Client Relationships, and False Statements (18 U.S.C. § 1001)* was served upon the following Defendants by the Sheriff at their respective addresses as listed below:

SILVERMAN, THOMPSON, SLUTKIN & WHITE
BRIAN THOMPSON
MONICA SCHERER
ANDY WHITE
STEVE SILVERMAN
RICHARD KARCESKI
ANDY SLUTKIN
400 E Pratt St Suite 900
Baltimore, MD 21202


WRIGHT, CONSTABLE & SKEEN
MICHEAL STANLEY
HOWARD SCHULMAN
1 Olympic Place, Suite 800
Towson, MD 21204

Method of Service: Maryland Sheriff

Dated: Friday, 2025